The next matter on our calendar is Vista Food Exchange v. Champion Food Service. I don't know where they went. You looked all over. Where did you look? On the floor. Thanks. Good morning. Good morning, Your Honors. May I please report, Jonathan Scott for the appellant, Vista Food Exchange. With regard to two of the defendants on the jurisdictional issue, we saw from our research that each of Your Honors has been involved in construing cases that deal with consents to jurisdiction. And consents to jurisdiction are contractual and they are enforceable. And what Judge Sweet did is he allowed the defendants to essentially controvert the allegation, which brought into play the consent to jurisdiction. So Vista sued its customer, B.C. & G. Weissman. The relationship with B.C. & G. Weissman was open with an application for credit that they sent to us in which they unequivocally consented that any dispute related to liability or debt involving that account would be litigated in the New York courts. And that was signed by their president, Tyrone Weissman, who also, you have all of these people that are the defendants here. Now, I just want to slide aside. I just want to make it clear for the record. Linda Atkinson, the assistant, I think counsel may have indicated that they thought we were still pursuing that. We found out as a result of other investigation that she was acting as an administrative clerk and she was unaware of the fraud that was going on. So in our second amended complaint, the operative complaint, we dropped her. So there's no need for the court to address any issue with regard to Linda Atkinson. But with regard to the other parties, what we have going on here is a relationship that started, a business relationship between Vista Food Exchange, a New York company in the Hunts Point Market, and a company in Ohio, B.C. & G. Weissman, that wanted to buy food products from us on credit. So they applied, and our condition was, as is our standard condition, that if we have to sue you over the account, that we can sue you here in New York. And they agreed to that. And I know that Judge Sweet made some allusion to the fact that there's a case pending brought by Champion Food Service in Ohio. I just want the court to know, and it was a point that was conceded by defense counsel in the oral argument, in the first oral argument, that that case, it's not an overlap of claims. The case in Ohio has to do with claims of wrongdoing alleged by them involving Vista and only Champion Food Service as the plaintiff there after we were no longer doing business, after the relationship broke up. Our case goes back to 2011. The only connection with the Ohio case is how we found out that we were defrauded and how we found out that B.C. & G. Weissman cheated us intentionally. And the way that it was uncovered is that in this litigation, they have these pricing charts in which they were representing that their non-food costs, this is a packing plan to pack food items that are prepackaged, that we were sourcing for them. And they told us consistently that it cost them $0.28 to $0.30 to pack each meal. Now they sue us in Ohio on this other case, and they claim that they would have made this huge profit on a contract that we were awarded in a competitive bidding situation. And that packaging, which was much more labor intensive than what was involved with us, now that they're suing us, they said, and they swore under oath, that their real non-food costs were $0.10 a meal and not $0.28 to $0.30. So that's how we found out. They're saying that in the other suit? That's right, Your Honor. So in that case, they said, now that they're suing us for damages, that their actual costs were really $0.10 a meal to do the packing. Can I turn to the heart of this matter? Absolutely. I may agree with you that the district court was in error in finding no personal jurisdiction over Champion. He stated the wrong standard. It doesn't have to be an alter ego in New York. It only has to be closely related. But turn to the 12 v. 6 issues. Where's the proof? It's almost all speculative. Where's the heart of the case? Well, the heart of the case, Your Honor, starts with, and it's documented, besides the allegations and the complaint, the heart of the case is that our relationship with selling the food items was to be C&G Weidman. And I'm not just saying that that's what we allege. What I'm saying is when you look at, in the record, the application for credit, that's the customer. But how did you prove or at least allege fraud? We allege fraud on the basis that they misrepresented, that they used credits that were fraudulent to not pay the invoices, which are all in the record. So in the record, what it shows, Your Honor, in terms of documents, are you asking about allegations or what the other documents are? I'm asking whether your complaint satisfies the basic rules of pleading under 12 v. 6. And, Your Honor, we believe it pleads a proper cause of action. There's two causes. There's multiple causes of action. But on the fraud cause of action, what we have alleged is that they made misrepresentations. This is $0.28 to $0.30, that it was false, and that we show that their own document, their pricing model, shows exactly how they did it. So it's not only that we allege. So we made the allegation, but we also incorporated by reference, which is appropriate to do, on our second amended complaint. We attached the instrument of fraud, that pricing spreadsheet that was their internal document. Which stands by itself without any explication, this document. Well, what I'm saying beyond that, I think there is explanation. Without context, what can we draw from this chart? I think what we can draw from the chart, Your Honor, is there's no other reasonable conclusion at the pleading stage with regard to plausibility that this is indicia of fraud. And the reason why I say that, Your Honor, is when you look at the pricing chart, they have the same items on the non-food cost, like, for example, labor. The labor cost doesn't, or the overall cost doesn't go on the same item. Column 1, $0.10. Column 2, $0.17. Column 3, $0.28. When all of the items that make up the cost are all of the same item. Well, what it says, and here I think this is helpful to you, it describes something as some sets of costs as actual. And then it says proposed model for VISTA. But is there, where in the complaint is it alleged, and if there's documents attached, what documents show that the proposed model is what was actually used in charge to you? In other words, it says proposed model. I don't know, maybe that's a proposed fraud, or maybe it's we should really charge them this because actually our previous models aren't so good. But whatever it means, what is the indication that this is what you were billed? Where is it alleged that you were actually billed according to the so-called proposed model on the spreadsheet? It's what it says in the amended complaint, that we would charge more than the actual cost. I don't recall it actually saying we would charge $0.28 as opposed to. Because the invoices, it's very hard to figure out from the invoices what the charges are based on. Right. And, Your Honor, my point is, as I know this Court has recognized and everyone here would recognize, when someone is committing a fraud, they try to conceal what they're doing. So what I would strongly suggest is it would not be in the interest of justice to allow them at the pleading stage to avoid our opportunity to further develop, to make a record that shows that what we've alleged is that they specifically represented to us that the invoices that we got were based on their actual cost of $0.28 to $0.30 a meal. And you can see from the chart that you were referring to that the proposed cost and all of those numbers, there is a huge difference. What they say is the actual. Right. And let me just try to follow out so I make sure I understand your theory. That, what you just said, assuming we think that that is an adequate set of allegations, that would apply directly to Champion. And the District Court never got to the merits on Champion because it found no personal jurisdiction. So if we find personal jurisdiction, we would either then have to go on to consider the 12B6 arguments that are raised or send that back to the District Court vis-a-vis Champion. Right. Now, there's a separate issue, which is the District Court, as to B, C, and G, agreed that there was personal jurisdiction and then said on the merits that there is no fraud charged as to B, C, and G. I'm just going to say something and see whether I got it right. You can tell me if I got it right as to your theory, is that without needing to say alter ego or pierce corporate veil or anything like that, that in effect, even if Champion were a totally independent entity, which isn't exactly, there's a kind of conspiracy here that B, C, and G and Champion are working together in this. And is that the idea that B, C, and G is responsible for any fraud that Champion does because the whole point of it is to redound to B, C, and G's benefit because they're the ones that are getting billed? That is one of the theories. However, Your Honor, I don't think, at least we didn't read Judge Sweet's order quite the way that you did. My reading of it was that what Judge Sweet said is on the second order, I'm not passing on the question of consent on B, C, and G. He seemed to indicate, look, they signed a consent. If that's what this case is about, then we're moving forward. And with regard to Champion Food Service, I just wanted to be clear that we have also pled a separate contract claim. Our theories are, with regard to B, C, and G Weitzman, we are suing them for breach of contract, which is covered by the consent to jurisdiction. And this is the breach of the oral contract. Right. It's been referred to that way, Your Honor, but I just want to make it clear that there are documents that collaborate that there was a contract, that there was a relationship, and the first one is the credit application that was signed. But we have the credit application, we have the guarantee, and we have the continuing guarantee, right? And then we have a lot of invoices and charts, but there's no overarching written document reflecting the arrangement that you described in terms of the packaging credit and the selling at one cent above cost and so on, those elements. Is that right? Some of those elements, Your Honor, absolutely are based upon an oral agreement, but other aspects of it they have admitted to. So, for example, when they moved to dismiss on the point you raised or the question you asked about the packaging, they said that they had an agreement with the champion had an agreement with VISTA to sell the packaging back to us at a significantly discounted margin. And so what we're alleging here is, because I think it's important from the standpoint of the fraud issue, our position is that irrespective of the court's ruling on the fraud issue, our view of it is make it as simple as possible. VISTA Food Exchange has a valid claim against B.C. and G. Weisman for breach of contract because it wasn't paid all of the money that it was due, and that that is embraced within the consented jurisdiction, so there is no need for any 302 analysis or due process analysis. And so with regard to that contract claim, that should suffice. Counsel, your time has long expired. I'm sorry, Your Honor. But you have reserved three minutes for rebuttal. Yes, thank you. We'll hear from champion. May it please the Court, Michael Orozco on behalf of all defendants. I'd like to start off by first addressing the one comment made by counsel as a question with regards to whether or not B.C. and G. had, in fact, paid all its debt. There's this claim where, in essence, what the plaintiff is attempting to do is argue that B.C. and G. somehow received the benefit of these prices, these higher costs, this fraud that champion purported to commit, which then resulted in B.C. and G. getting some sort of benefit, which now results in a debt. But there isn't a single case, there is no case law whatsoever that supports that argument. It's not possible, and it's not under any of the agreements that he can try to convert it into that. So when an appellant's counsel claims B.C. and G. owed money, that is not a fact. There isn't a single debt, there isn't a single aspect in the record that he can point to in which he can claim that B.C. and G. acknowledges that it owes some type of money to VISTA. Getting to the pleadings, Your Honors, VISTA's allegations all are formed around this payment obligation that supposedly B.C. and G. had, and in essence, it's this, again, this conversion, this argument that somehow B.C. and G. receives the benefits of Champion's inflated prices. And in essence, the only connection that we have between B.C. and G. and Champion is Mr. Whiteman. That's it. The documents, though, suggest the continuing guarantee that Mr. Whiteman executed says B.C. and G., Whiteman, DBA, Champion Foods, right? And then the other corporate guarantee agreement says B.C. and G. is executing this on behalf of Guarantor's subsidiary named Champion Food Service. Oh, it's late in the game, counsel, to say that they're unrelated.  I did say and I am stating that the relationship between the parties is one of business. They do business with each other, and the relationship is, in essence, founded by or, shall we say, brought in. Well, that may or may not prove to be a fact if the case goes to trial or if there's further discovery. But the plaintiffs allege there's a closer connection than that, and that would seem to be supported by this guarantee document that says B.C. and G., Whiteman, DBA, Champion Foods. That may not be true, but isn't that some evidence that Champion is actually much more closely related to B.C. and G.? It's about the only evidence that the appellant can point to, Your Honor, but I would point out for the record when we look at the affidavits of Mr. Whiteman, which were provided as part of the pleadings and which were submitted as part of the motions and we submit that Judge Sweet was entitled to review those affidavits, it's part of the things that he may consider in reaching and rendering a decision as to whether or not to dismiss based upon. Well, as to personal jurisdiction, but even there, if he considers the affidavits, if you've got contradictory evidence or contradictory affidavits, is the judge entitled to make a decision that I like your affidavits better than their affidavits without giving any jurisdictional discovery to probe the truthfulness of those affidavits? The question, Your Honor, is whether or not the appellant provided any other affidavits or provided arguments that contradicted those affidavits. And I would submit that there weren't sufficient arguments that contradicted at least what Mr. Whiteman said with regards to the relationships and the compositions of B.C. and G. as well as Champion. So much so, Your Honor, that it would be, in my opinion, it would have been improper for Judge Sweet to simply rely upon the factually inept pleadings of the appellant in essence where he's saying there is some sort of subsidiary relationship here when in the affidavit submitted by Mr. Whiteman, he is acknowledging and showing that there are these different organizations and groups, different types of corporate officers. But I'm confused. What was the judge to make, then, of Mr. Whiteman's own signing this document himself characterizing B.C. and G. as DBA, Champion Foods, and the other as B.C. and G. executing this agreement on behalf of Guerin to a subsidiary? Doesn't that contradict his affidavit? I mean, that at least creates a genuine issue of fact as to the relationship between the companies, doesn't it? I think that to the extent that the wording itself is, it speaks for itself, Your Honor. It is contradictory. But I would submit that I think the judge viewing all of the other facts that were before him, especially with regards to the personal jurisdiction issues, it was very easy for him to find that in essence the way this matter was pled, which requires, quite frankly, a lot of exercise in understanding the complexity. I mean, I don't think you can create a flow chart big enough to try to seem the arguments that the appellant is trying to make here. So we have B.C. and G. entering into an agreement. It's supposed to, in essence, pay certain amounts. And by way of it having gotten the benefit of the higher cost by Champion, it offsets what it owes to Vista, which in turn allows Vista to sue B.C. and G., Weithman, and Champion in this jurisdiction, knowing that they are Ohio corporations, knowing that the vast majority of contacts were going with California, knowing that none of the deliveries ever occurred to New York. And the only thing that they can use and try to argue to tie it into this jurisdiction is the one agreement that mentions the choice of venue clause for New York. There are two of them, actually, right? It's the credit application, which turned into a credit agreement, and the second is the continuum guarantee, both of which contain the language about litigation of all kinds arising from the transaction subject to this guarantee shall be subject to venue and so on in New York. And so on exactly, Your Honor. But in order to get to that point, one would need to find, and Judge Sweet did not find, based upon the contacts with Champion, that there was no jurisdiction for Champion. But I think he was in error in that because he used the alter ego test instead of closely related. I believe when Judge Sweet referred to, and at least the appellant refers a lot to the Maureen Midland case, what the judge found, in essence, was insufficient factual pleadings, which would, in essence, give rise to any support to the allegation, because it was nothing more than a simple factual allegation. Upon information and belief, this is an alter ego. Upon information and belief, in essence, B, C, and G is controlled by Champion or vice versa. And that was, by itself, insufficient. There was no evidence provided, none whatsoever. But Weitman is signing a document that says Champion is just a DBA. It's undisputed that Weitman is a common element between the two and maybe has some control over each of them. They have no way of knowing all the inside documents and whether they're true or not. So one issue is why don't they just get some discovery to be able to test the adequacy of your proof, given that it's been represented to them by B, C, and G and by Weitman on behalf of B, C, and G that these are the same entity, and normally it's a little odd for one company to totally guarantee the debts and liabilities of a different company if there isn't some close relationship between them. And I would agree with that, Your Honor. However, what I will point out is we have the Ohio litigation, which has lasted for years. And in that litigation, the appellant has had the opportunity to find everything out about these defendants, to put them in a position to be able to make a valid argument with regards to that alter ego status. And despite years of— Is that an issue in the Ohio litigation? I don't believe it is an issue. Jurisdiction is not an issue there, is it? No, it is not, Your Honor. However, there have been extensive depositions. There's been extensive discovery. And although I am not a participant in the Ohio litigation, I'm certainly privy to what is happening there. Well, but is the relationship between B, C, and G and Champion relevant to that litigation such that discovery would be permitted and possible as to that relationship if Champion's the only party? I can't answer that question, Your Honor. Well, you're the one who's saying that they could have gotten all this discovery in that litigation. No, what I am saying, Your Honor, is that the appellant had every opportunity to go into that. The appellant knows— But did they? If it's not—if you're saying you can't tell us that that's even a relevant issue in that case, I'm not sure that you can go into a litigation where somebody's suing you, as I understand it, for alienating the affections of the president of Champion, hiring him away, and then stealing trade secrets through him. I don't know that that gives any license to VISTA in contesting those allegations to send an interrogatory that says, tell us about how you're related to B, C, and G. At least on the surface of it, there might be an argument that they're entitled to that. I don't know. But based on the little I know about the litigation, a judge might say, what is B, C, and G? They've got nothing to do with this case. I quashed that. I agree with that, Your Honor. My time is up. Thank you, counsel. Mr. Scott, you're reserved three minutes for rebuttal. I want to respond to one of the comments by Appellee's counsel where he says, there's absolutely no basis for a connection between B, C, and G, Weisman, and Champion as pertains to the claims in this case. And the panel has already brought out, well, Mr. Weisman himself represented and acknowledged that it's a subsidiary, there's personal guarantees, the close connection is there. But in addition, this is not a theoretical claim. At pages A90 through A90 through A101, we have given the court the invoices from Champion Food Service in which you'll see that they say, pay this net 21 or apply credit. And the customer number that's listed on their invoice on the billing to VISTA is the account of B, C, and G, Weisman. So this interrelationship, counsel can say whatever he wants about it. Mr. Weisman submitted an affidavit. They're separate entities. They have not all of the same ownership. But vis-a-vis the underlying matters that we're suing under, they use this subsidiary's fraudulent scheme to not pay us the money that we were owed from B, C, and G, Weisman on the account. They actually took the credits on all of these invoices and many more rather than paying for the food items that B, C, and G bought from VISTA Food Exchange. On the affidavit issue that Judge Lynch asked. Could you pause for a minute and just take one of those pages and direct us exactly to what you're describing? Absolutely, Your Honor. I'm referring to page A90 of the record. Okay. This is an invoice from Champion Food Service to VISTA Food Exchange. Yes. And it says under terms in the box on the right side, under the invoice number, net 21 or apply credit. And so what they did, they're telling you there's no direct relation in the underlying events that we're suing on between Champion and B, C, and G, Weisman. These things are totally unconnected. And the customer number 175 at the top, you're saying that's B, C, and G's account? Yes, because, Your Honor, and there's an affidavit in the record from the president of VISTA Food Exchange, Mr. Pacifico, that confirms this, that Champion Food Service never had an account with VISTA Food Exchange. So this whole thing, B, C, and G, Weisman is at the center of this whole litigation. And that's why the consents come into play. And they decided to handle it this way. They didn't separate it. Counsel's telling you everything was separate. They decided that rather than paying, rather than having B, C, and G pay the money that it owed, which it guaranteed and promised under the credit agreement that it would pay, it would write us a check, it would wire us the money, it used these credits that we say are fraudulent from its subsidiary.  You haven't had damning of a million dollars, and you cited that certain invoices were delivered. Money was paid, right, on the invoices, but you're saying that it wasn't enough, that a too large offset was applied. Is that right? That's the essence of it. And do you know the size of the offset, or is that part of what you're trying to determine? No, that's part of what we need to calculate. We don't have a computation as of yet, and we'll need discovery. Do you have a range? Do you have an idea of you think the offset was overstated by a certain amount? I mean, was the $800,000 the amount of the underlying transactions that was paid? No, that's the amount. That is, and it has not been audited yet. That's a number that's been thrown about between the parties. I have to go back, and we haven't had a chance to work that out. But what I would say, Your Honor, is I think that the amount in controversy with regard to the overpayment is in the few hundred thousand dollar range. Do you have a number? How many transactions would you say are at issue? Your Honor, my understanding is that there were over that two-year period over 50 transactions. Five-oh. Between the parties, yes. Okay. Over 50 transactions. I also, on the affidavit point, so counsel argued that it was okay for Judge Sweet to just take their affidavits because we weren't able to adequately controvert what they were alleging. And the Maureen Midland case that we've cited says clearly that that's not the way that it works if the court is not going to hold an evidentiary hearing. Now, our view of it is we're not really we're asking in the alternative for the evidentiary hearing, but we think that we have established that it's unnecessary to do that because of the consents to jurisdiction, because of the closely related party. That deals with Weizmann, BC&G, and Champion Food Service. With regard to Ashley Simpson, we have less on her. Our view is on that. Since the court didn't order a hearing, we think we made a prima facie showing to continue moving forward. Also, on the other point that the court asked me about, besides the complaint and lawyers, you draft a complaint and if you had more information, if you knew all of the underlying intricate details of exactly how they carried out the fraud, we would have put it in. But we're at the pleading stage of the case. But I would point out, Your Honors, that we did supplement or amplify the pleading with affidavits, which is permissible in response to a motion to dismiss, and that affidavit includes the affidavit from Matthew Gibson, who they say was the former president of the company at page 384 and 385, to Judge Lynch. Your question, was it ever quantified how much we were overcharged? He was there and he talks about what they represented, and he says in paragraph 8 that the chart shows, used by Simpson and Weitman, show how these non-food costs were inflated by as much as 60% and that they were false. Thank you. Your time has expired. We will reserve decision. Thank you both very much.